# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-256 (JMC)** |
| **v.** | : | |
| | : | |
| **SAMUEL FONTANEZ-RODRIGUEZ,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Samuel Fontanez-Rodriguez to 30 days of home detention, a 36-month term of probation, 60 hours of community service, and $500 restitution.

### I.    Introduction

Defendant Samuel Fontanez-Rodriguez, 34 years old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Fontanez-Rodriguez pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in a Capitol Building. As explained herein, a sentence of

---

[1] Although the Statement of Offense in this matter, filed on November 4, 2022, (ECF No. 20 at ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Case 1:22-cr-00256-JMC   Document 25   Filed 01/19/23   Page 2 of 19

home detention is appropriate in this case because the defendant (1) scaled a Capitol West Terrace wall in order to reach the Northwest Terrace and Courtyard, and assisted at least one other rioter in doing the same, (2) took multiple videos and photos of the chaos erupting at the west front of the Capitol, (3) entered the Capitol through a broken window next to the Senate Wing Door just two minutes after their initial breach and walked to the other side of the building before exiting over the span of approximately one minute, and (4) in the days immediately following January 6, 2021, expressed pride in his actions by sending messages to others with images of the riot and referencing the media attention his acts later received, not remorse.

The Court must also consider that the defendant's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and to disrupt the proceedings. Here, the facts of and circumstances of the defendant's crime support not only a 36-month term of probation, but also a sentence of 30 days of home detention.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 20 (Statement of Offense), at 1–3.

### Defendant Fontanez-Rodriguez's Role in the January 6, 2021 Attack on the Capitol

The defendant traveled with multiple friends, including sentenced Capitol Riot defendant Jackson Kostolsky, 21-cr-197 (DLF),  from his residence in Emmaus, Pennsylvania to Washington, D.C., to attend the Stop the Steal rally on January 6, 2021.   The defendant distinctively wore a black sweatshirt, black balaclava-style facemask, a red hat (first a baseball

cap, and later a beanie), a backpack, and brown boots. *See* Image 1 (Fontanez-Rodriquez's and Kostolsky's faces are not redacted).[2]



Image 1

He eventually moved to the West Front lawn of the Capitol and took a multitude of videos and pictures of the chaos erupting at that location. *See, e.g.*, Image 2 (screenshot from video).



Image 2

---

[2] In this Image and following Images, the defendant is marked with a red circle.

One of the defendant's videos—taken from atop a pallet of inauguration equipment on the West front near the Senate-side scaffolding—depicts the mass of rioters with interspersed clouds of smoke or tear gas. *See* Image 3 and Image 4 (screenshots from .  At the beginning of this video, the defendant can be heard shouting, "Hold that line!  Hold that line!"



Image 3                                    Image 4

Sometime thereafter, the defendant scaled the West Terrace wall of the Capitol.  Video recorded by another rioter depicts the defendant's ascent.  *See* Images 5 and 6.




Image 5                                    Image 6

A widely circulated photo taken by the media and featured in a New York Times article[3] depicts the defendant at the top of the wall looking down at Kostolsky's subsequent ascent.  *See* Image 7.

---

[3] The article that the photo accompanies is titled "A Shattering Blow to America's Troubled Democratic Image," available at https://www.nytimes.com/2021/01/07/world/europe/macron-merkel-trump-capitol-democracy.html (last accessed January 6, 2023).



Image 7

Another similar media image depicts the defendant reaching down to assist Kostolsky's climb. *See* Image 8.



Image 8

In the days immediately following January 6 and upon discovering the New York Times article and photo, the defendant shared the media attention with friends over text message in

multiple instances.    When one recipient expressed concern over possible identification, the defendant said, "They'd have to investigate 1000s."    The other individual later messaged, "I'm waiting for our pardon from Trump."    The defendant replied, "Lol. Me too."    The defendant bragged to another individual that "We got NYT."[4]

At approximately 2:15 p.m., the defendant entered the Capitol building through a broken window next to the Senate Wing Door.    This was only moments after the first breach of the Senate Wing Doors at 2:13 p.m.    He remained inside the building for approximately one minute before departing—as ordered to do so by police—through the Senate Carriage Door at approximately 2:16 p.m.    *See* Images 9 and 10.




Image 9                               Image 10

*Defendant Fontanez-Rodriguez's Interactions with Investigators*

On January 22, 2021, the defendant called the FBI National Threat Operations Center.    In this call, the FBI reported that the defendant conveyed the following:

Fontanez called the FBI to clear his name.
On 01/06/2021, Fontanez was at the Capitol rally. He went there for a rally, support, and for Alex Jones, who he was about 50 feet away from.
There was tear gas and smoke bombs, which messed Fontanez up; and things got hectic. Fontanez said he was inside the Capitol for one minute. The only door he opened was the door to get out of the Capitol.

---

[4] "NYT" refers to the New York Times article and associated image.

> Fontanez's time spent there was from 2:05 p.m. to 2:22 p.m.
> At 2:22 p.m., Fontanez was inside the Capitol. After he was inside, he turned around
> and left. Once he was outside of the Capitol he turned around took a photo of
> Capitol then he left.

However, according to text messages sent on that same day by Kostolsky (with whom the FBI had already made contact), "Sam [i.e., Fontanez-Ramirez]called them so I didn't have to snitch him out.  We'll see what happens they told my mom they'd be back in a few days."

The defendant was interviewed again by the FBI on January 25, 2021, and March 19, 2021. In the January 25 interview, the defendant confirmed that he made the January 22 call.  During the March 19 interview, the defendant admitted that he walked past a metal detector and mentioned taking a single photo of the Capitol as he left the building at approximately 2:22 p.m.   The defendant also provided some of the articles of clothing that he wore on January 6 and disclosed his phone and laptop passcodes.

*The Charges and Plea Agreement*

On July 6, 2022, the United States charged the defendant by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). On July 22, 2022, law enforcement officers arrested him during a voluntary surrender at the federal courthouse in Allentown, Pennsylvania. On July 25, 2022, the United States charged the defendant by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G).  On November 4, 2022, pursuant to a plea agreement, the defendant pled guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, the defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of violating 40 U.S.C.
§ 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant
faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay
restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States
v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor,
the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies
the factors a court must consider in formulating the sentence. Some of those factors include: the
nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the
defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote
respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, §
3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as
described below, the Section 3553(a) factors weigh in favor of 30 days of home detention,  36-
month term of probation, 60 hours community service, and $500 restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy."
*United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds
of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while
staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States
v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the

defendant's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Fontanez-Rodriguez, the absence of violent or destructive acts is not a mitigating factor. Had the defendant engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in this case is the defendant's blatantly unpermitted scaling of the West Terrace wall, followed by his breach into the Capitol building.  While the defendant ultimately spent only a single minute in the Capitol building, that presence was preceded by his observations of chaos on the west front and presence for the first pushes and eventual breach by the mob of the Northwest Terrace area and Senate Wing Door.  By scaling the wall and joining the mob, Fontanez-Rodriguez contributed to the empowerment and emboldening of the other rioters in their violent siege of the Capitol building.

To the defendant's credit, his interviews with the FBI and quick decision to plead guilty following the filing of the information in this case are all mitigating factors that the Court should consider.  However, while the defendant affirmatively engaged with investigators, his initial reactions to the riot in the period of time immediately following January 6, 2021, were those of enthusiasm and excitement.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of home detention in this matter.

### B.  The History and Characteristics of Fontanez-Rodriguez

As set forth in the PSR, the defendant's criminal history is small and includes an adjudication for simple assault at age 13.  The defendant's record also includes dismissed charges stemming from arrests for two DUIs and receiving stolen property, as well as an accelerated rehabilitation disposition associated with an arrest for charges of false swearing, theft by deception,

and criminal conspiracy.  The defendant reported being employed as a night-shift forklift driver in Phillipsburg, New Jersey.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant's immediate reactions following January 6, 2021—as demonstrated by his prolific sharing of the NYT article and picture—demonstrate a need for specific deterrence. This is also shown by the fact that the defendant climbed the wall of an important historical landmark, vaulted through a broken window, traversed the entire way from one side of the Capitol to another, and celebrated that he "got the NYT."

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence the defendant based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Fontanez-Rodriguez has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C.§ 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

14

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the

spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

For example, in *United States v. Kostolsky*, 21-cr-197 (DLF), the government recommended a 30-day sentence of incarceration for one of the Fontanez-Rodriguez's companions on January 6, 2021—Jackson Kostolsky. Kostolsky climbed the West Terrace Wall, entered the Capitol through the Parliamentarian Door 30 seconds after its initial breach, and remained in the Capitol for less than a minute before leaving when Capitol Police officers shouted "Get out!" and another Capitol Police officer started pushing rioters out of the door. [6]  Later that day, he texted friends that he had been tear-gassed but nonetheless "just kept advancing" and also stated that "I had fun" and the politicians were "crawling with fear." He also initially lied to the FBI, denying that he had entered the Capitol, and he deleted videos from his phone. The court sentenced Kostolsky to 30 days of home confinement with a 36-month term of probation and ordered a mental health assessment.

In *United States v. Watrous*, 21-cr-627 (BAH), the court imposed 14 days of intermittent confinement as a condition of 36 months' probation, and two months of home confinement, where

---

[6] Kostolsky is the individual that the defendant is looking down at in Image 5. Kostolsky is also the left-most individual in Image 1.

the defendant, among other things, took a photo of a damaged window by the Upper House Door but then still entered the Capitol building and stayed for five minutes, and watched as a man went stole wine reportedly from Speaker of the House Nancy Pelosi's office, and the defendant reentered the Capitol building again later despite seeing those things that should have given him misgivings. In the instant case, Fontanez-Rodriguez was in the Capitol an even shorter period of time, and the government has recommended a lesser period of home detention.

In *United States v. Dillon,* 21-cr-360 (DLF), the defendant sent inflammatory text messages to a friend prior to entering the Capitol grounds, stating that "an all out civil war may start. It will be fast because our side is more prepared." Upon reaching the Capitol grounds, she worked her way through the crowd. However, upon reaching the Senate Carriage Door at 2:18 p.m., she fell, and although she stood back up, the Capitol police there were able to push her back and to the side, and close the doors, preventing her entry into the Capitol. The defendant pled guilty to violating Section 5104(e)(2)(D), and the court sentenced her to 60 days of home detention and three years of supervised release. While Fontanez-Ramirez actually entered the Capitol, unlike Dillon, he did not express the same apocalyptic viewpoint that suggested a willingness to engage in civil war, and so he is less likely to recidivate.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days home of detention, a 36-month term of probation, 60 hours community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Nathaniel K. Whitesel*
       NATHANIEL K. WHITESEL
       Assistant United States Attorney
       DC Bar No. 1601102
       601 D Street NW
       Washington, DC 20530
       nathaniel.whitesel@usdoj.gov
       (202) 252-7759

**<u>CERTIFICATE OF SERVICE</u>**

On this 19th day of January, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759